**Judith R. SWADER, Administratrix of the Estate of Billie Jo Dickens, Deceased, Plaintiff,**

**v.**

**COMMONWEALTH OF VIRGINIA, et al., Defendants.**

**Civ. A. No. 90–1111–N.**

United States District Court, E.D. Virginia, Norfolk Division.

July 19, 1990.

William D. Breit, Breit, Drescher & Breit, Norfolk, Steven J. Marsey, Glasser & Macon, P.C., Chesapeake, Va., for plaintiff.

Peter R. Messitt, Richard F. Gorman, III, Richmond, Va., for defendants.

ORDER

CLARKE, District Judge.

This matter comes before the Court on the defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure.[1] The Motion is made on behalf of all defendants, except the Commonwealth of Virginia. The question presented is whether the substantive component of the Fourteenth Amendment's Due Process Clause can impose upon the State an affirmative duty to protect an individual outside of a strictly custodial context.

The critical facts, construed most liberally to the plaintiff from her complaint and from representations of plaintiff's counsel during argument, are these. In February of 1988, Judith Swader was employed as a nurse in the medical department of the Southampton Correctional Center, a state operated penal complex, located in Capron, Virginia. As a condition of her employment, it was required by the defendants that she maintain her residence on State prison property. The residence where she and her daughter, Billie Jo Dickens, lived was outside of the fenced-in portion of the prison where the inmates were lodged, but inside an area containing other prison related buildings belonging to the correctional center. It is alleged by plaintiff's counsel that the only roads within this area of prison property are private roads built and maintained by the State for use in the operation of the penal facility. On Febru-

ary 21, 1988, James T. Waller, an inmate at Southampton Correctional Center serving a life sentence for rape, was, according to the plaintiff, negligently permitted to drive out of the confines of the fenced-in portion of the prison and allowed to work unsupervised outside the prison gate in violation of prison regulations. Prison regulations required that all inmates working outside of the fenced-in portion of the prison were to be accompanied by a prison guard. While outside of the prisoner lodging area but still on the complex grounds, Waller entered Swader's residence where he raped and strangled Billie Jo Dickens to death.

Plaintiff's cause of action is brought pursuant to 42 U.S.C. section 1983 on the theory that various state corrections officials deprived Billie Jo Dickens of her life and liberty interests by failing to prevent a dangerous inmate from roaming about, unaccompanied by a prison guard, the area of prison property where prison employees were required to maintain their residences.[2] The defendants move to dismiss the section 1983 claim arguing that the State owed plaintiff's decedent no affirmative, constitutional, duty to protect her. The issue of whether the State may, under any circumstances, fall under a constitutional obligation to take affirmative steps to protect

---

1. As a threshold matter, plaintiff concedes that under section 1983, no liability may be imposed against a state official in his official capacity. *Will v. Michigan Department of State Police, et al.,* —— U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Thus, this suit is brought against the defendants in their individual capacities only. Suits against state agents in their individual capacities for actions taken in their official capacities have been recognized by the Fourth Circuit in *Richard Anderson Photography v. Brown,* 852 F.2d 114 (4th Cir.1988), *cert. denied, Richard Anderson Photography v. Radford University,* 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989):

> The mere fact that her conduct was undertaken in the course of her state employment does not of course relieve her of individual liability, even if her employer could not be sued for it. A state may no more than an individual principal give its agent authority to commit torts without civil recourse.

*Id.* at 122. Accordingly, the defendants are amenable to suit in their individual capacities

for the claimed deprivations of plaintiff's constitutional rights.

2. Although the complaint contains numerous allegations, the thrust of the complaint is that the defendants were aware of the inmate's violent history and yet permitted him to work unsupervised outside of the prison gate in violation of an affirmative constitutional duty to protect the Billie Jo Dickens. The complaint also asserts that the defendants acted with gross negligence and with deliberate indifference to the constitutional rights of the plaintiff in that: they failed to develop and implement a classification system which would identify violent-prone sex offenders; they failed to prohibit such violent inmates from leaving the security premises of the prison unattended and without guards; they failed to hire, train, supervise and maintain prison employees relative to the release of violent inmates outside the security premises of the prison; and they failed to take cognizance of the existence of a risk of harm to those residents on the prison property posed by the unattended release of violent-prone convicted sexual offenders outside of the security premises of the correctional institution.

an individual outside of a strictly custodial context is purely a question of law and is, therefore, properly before this Court at this time.

## I.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." Section 1983 of the Civil Rights Act protects against action under color of state law that "subjects ... any citizen ... or other person ... to the deprivation of any rights secured by the Constitution and laws" of the United States. Thus, the first step in evaluating a section 1983 claim is determining whether plaintiff has been deprived of such a right. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).

■ Here, plaintiff asserts that Billie Jo Dickens possessed a constitutional right to be protected by the State from the harm inflicted on her by an inmate under State control. Specifically, plaintiff argues that the State's failure to prevent Waller from travelling unaccompanied by a guard, in an unsupervised area where prison employees are required to maintain residences, effectively deprived Billy Jo Dickens of life and liberty rights secured by the Fourteenth Amendment.[3] A threshold determination,

then, must be whether the State owed an affirmative obligation to the deceased to protect her from harm.

The question of affirmative duty and constitutional tort outside of a strictly custodial context has been addressed by the Fourth Circuit in *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983), and *Jensen v. Conrad,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), and most recently by the Supreme Court in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Plaintiff argues that *Fox* and *Jensen* recognized, in dicta, that an affirmative duty to act, enforceable by the Fourteenth Amendment's Due Process Clause, may arise if the victim had entered into a "special relationship" with the State. Defendants contend, however, that the reasoning of *Fox* and *Jensen* has been rendered suspect by the Supreme Court's decision in *DeShaney.* For the reasons stated below, this Court finds that the *Fox–Jensen* analysis still carries precedential value in this district, and that the Supreme Court's decision in *DeShaney* is factually distinguishable from the matter at bar.

## II.

■ The Constitution is a charter of negative liberties drafted, primarily, to tell

---

**3.** Loss of life or liberty caused by the mere negligence of state officials is not deprivation within the meaning of the due process clause. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). *Daniels* overruled *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), to the extent that *Parratt* stated that the mere lack of due care could deprive a person of life or liberty under the Fourteenth Amendment. Whether the loss of life or liberty caused by state officials' recklessness or gross negligence triggers the protections of the due process clause was specifically reserved in *Daniels.*

Common-law does recognize a duty arising from the "special relationship" between an employee and her superiors which imposes upon those superiors the duty to protect employees from the reasonably foreseeable attacks of third persons. The Restatement (Second) of Torts section 302B provides:

Risk of Intentional or Criminal Conduct—
An Act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another

through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.

Comment (e) to section 302B further provides: There are ... situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.

Whether the defendants satisfied such an obligation, and whether the failure to do so was so reckless or gross under the circumstances that this claim becomes one of a constitutional deprivation, *see Daniels, supra,* are factual questions better left for resolution on a motion for summary judgment or trial.

the State to leave people alone. *DeShaney*, 109 S.Ct. at 1003; *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982). "Its purpose was to protect people from the State, not to ensure that the State protected them from each other." *DeShaney*, 109 S.Ct. at 1003. It follows, then, that the Due Process Clause does not require the State to provide its citizens with particular protective services, even if those services are necessary to save a life. *See Harris v. McRae*, 448 U.S. 297, 317–18, 100 S.Ct. 2671, 2688–89, 65 L.Ed.2d 784 (1980) (no obligation to fund abortions or other medical services). Thus, the State cannot be held responsible under the Due Process Clause for injuries that could have been averted had the State decided to provide protective services. "As a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 109 S.Ct. at 1004.

The Supreme Court has, however, recognized certain instances where the Due Process Clause does impose upon the State affirmative duties of care and protection with respect to particular individuals. For example, in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court held that the Eighth Amendment's prohibition against cruel and unusual punishment, applicable to the State through the Fourteenth Amendment's Due Process Clause, requires the State to provide medical attention to incarcerated prisoners. The Court reasoned that since a prisoner was unable, because of the deprivation of his liberty, to care for himself, the State must assume the affirmative obligation to provide care for him. *Estelle* was followed by the Fourth Circuit in several similar section 1983 prisoner cases. *See, e.g., Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986) (death from pierced esophagus states claim if condition was apparent) and *Loe v. Armistead*, 582 F.2d 1291 (4th Cir.1978), *cert. denied*, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980) (delay in treating broken arm). Thus, *Estelle* and its Fourth Circuit progeny established an affirmative duty of care on the part of the State based on constitutional rights in the custodial setting.

In an analogous case, *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court extended the reasoning of *Estelle* beyond the Eighth Amendment prison setting to hold that involuntarily committed mental patients have a Fourteenth Amendment due process right to services necessary to ensure their "reasonable safety" from themselves and others. The rationale was the same; when the State deprives a person of his liberty and holds him in custody against his will, the State assumes a corresponding affirmative duty to provide for his safety and general well-being.

The question before this Court is whether the affirmative duties recognized in *Estelle*, *Youngberg*, and other cases discussed below, will support the proposition that the Due Process Clause imposes upon the State similar affirmative duties of care and protection outside of strictly custodial setting of a prison or mental hospital.

One such other case is *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In *Martinez*, the Supreme Court held that the State had no affirmative duty under the Fourteenth Amendment to protect a private citizen from the actions of a parolee. Martinez was a fifteen year old girl who had been murdered by a mentally deranged sex offender who was released on parole after serving only a fraction of his original sentence. The Court did not directly address the issue of a State's affirmative duty to provide protection to Martinez, but rather decided the case on narrower proximate cause grounds ruling that the causal connection between the decision to release the parolee and the murder of Martinez was too attenuated to hold the government liable. In dicta, however, the *Martinez* Court left open the question of whether a Fourteenth Amendment right would be recognized in less attenuated circumstances:

> We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a pris-

oner on parole. But we hold that at least under the circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.

*Id.* at 285, 100 S.Ct. at 559.

In 1982, the Seventh Circuit addressed the question left open by the *Martinez* Court in *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982). In that case, Marguerite Bowers was murdered by a schizophrenic with a history of criminal violence after he was released from a state mental hospital. Her estate filed a section 1983 claim against the hospital asserting that the state had reason to know that the former patient was dangerous and thus acted recklessly in releasing him. The Seventh Circuit disagreed stating that "there is no constitutional right to be protected by the State against being murdered by criminals or madmen." *Id.* at 618. The court limited its holding, however, to situations in which the State played no active part in placing the injured individual in a position of danger:

We do not pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm [i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Id.*

The Fourth Circuit followed the *Bowers* decision in *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983), a case factually similar to *Martinez.* In *Fox,* a young woman was injured when a parolee, who was already in violation of the terms of his parole, set fire to her house. Fox filed a section 1983 claim against the parole officers assigned to supervise the parolee alleging that the negligent actions of the parole officers, under color of state law, deprived her of constitutionally protected rights without due process of law. The district court dismissed the section 1983 claim on the authority of

*Martinez.* In affirming the district court's dismissal on the ground that the injuries were too remote from the challenged conduct to constitute a deprivation of rights, the Fourth Circuit expanded on the reasoning of *Bowers* to find that an affirmative duty on behalf of the state to protect an individual may arise outside of a strictly custodial context:

With one qualification, we agree with the Seventh Circuit's recent holding that, in general, there simply is "no constitutional right to be protected by the state against ... criminals or madmen," and that because, in corollary, there is no "constitutional duty [on the state] to provide such protection, its failure to do so is not actionable under section 1983." *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). The qualification—an important one actually acknowledged by the *Bowers* court, *id.*—is that such a right and corollary duty *may* arise out of special custodial or other relationships created or assumed by the state in respect of particular persons. For example—as we have held in this circuit—such a right/duty relationship may arise under section 1983 with respect to inmates in the state's prisons or patients in its mental institutions whom the state knows to be under specific risk of harm from themselves or others in the state's custody or subject to its effective control. *Withers v. Levine,* 615 F.2d 158 (4th Cir.), *cert. denied,* 449 U.S. 849 [101 S.Ct. 136, 66 L.Ed.2d 59] (1980) (prison inmates under known risk of harm from homosexual assaults by other inmates); *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir. 1979) (inmate under observed attack by another inmate); *Woodhouse v. Virginia,* 487 F.2d 889 (4th Cir.1973) (same as *Withers* ); *cf. Orpiano v. Johnson,* 632 F.2d 1096, 1101–03 (4th Cir.1980), *cert. denied,* 450 U.S. 929 [101 S.Ct. 1387, 67 L.Ed.2d 361] (1981) (no right where no pervasive risk of harm and specific risk unknown); *see also Spence v. Staras,* 507 F.2d 554 (7th Cir.1984); *Gann v. Delaware State Hospital,* 543 F.Supp. 268, 272 (D.Del.1982); *Walker v. Rowe,*

535 F.Supp. 55 (N.D.Ill.1982) (duty of state to protect guards).

*Fox,* 712 F.2d at 88.

The significance of the *Fox* decision was later explained in *Jensen v. Conrad,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), which involved 1983 actions brought against state and county agencies on behalf of children who died after suffering brutal beatings at the hands of their guardians. Although the claims were ultimately dismissed for failure to establish a constitutional right to affirmative protection, the Fourth Circuit did render the following dicta on the scope of the *Fox* court's decision:

Our ruling [in *Fox*], however, did not simply rehash *Bowers.* In two important respects *Fox* expanded on precedent. First, *Fox* completed the convergence of eighth and fourteenth amendment analysis that had begun in [*Doe v. New York City Department of Social Services,* 649 F.2d 134 (2d Cir.1981) ] and took shape in *Bowers.* The constitutional right that we asserted could arise was clearly based on the fourteenth amendment, both the shape and definition that we gave to that right by using the term "custodial or other relationship" was influenced in large part by the considerations that lay behind the eighth amendment cases. Recognizing that the fourteenth amendment could not be read to establish a general affirmative duty to the public at large, we chose to limit that duty by applying a rationale similar to that used in [*Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ]: namely, that where the state had selected an individual from the public at large and placed him in a position of danger, the state was enough of an "active tortfeasor" to make it only "just" that the state be charged with an affirmative duty of protection. . . .

Second, the *Fox* ruling was important because it stated in terms more explicit than *Bowers,* that a right to affirmative protection need not be limited by a determination that there was a "custodial relationship." The *Fox* court ruled that a

right to protection could arise from a custodial *or other relationship.*

*Jensen,* 747 F.2d at 194 (emphasis in original). While the *Jensen* court did not explicitly define what may constitute an "other relationship" for the purposes of creating an affirmative duty on the state to protect an individual, it did set forth three factors which should be included in an "other" or "special relationship" analysis. *Id.* at 194–95 n. 11. The application of these factors to the alleged facts at hand shows that a "special relationship" may have existed between the State and plaintiff's decedent.

The first factor is whether the victim or perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident. Here, as in *Fox, Jensen* and *Martinez,* the plaintiff's decedent was more like a member of the general public than an inmate in a prison or a patient in a mental institution. However, unlike the facts in *Fox, Jensen* and *Martinez,* the present state defendants were aware that Billie Jo Dickens faced a special danger in that she was required to live on prison property in an area where inmates, some of whom were sentenced to life, were allowed to work if accompanied by a guard. Thus, this case is distinguishable from the "general public" cases of *Fox, Jensen* and *Martinez* in that a particular harm to a particular individual was not only identifiable but arguably created by the state. This would argue in favor of finding that a special relationship existed.

Moreover, as discussed more fully below, the concept of "custody" is not so rigid as to be defined only in terms of a prison or mental hospital. As pointed out in *Estelle* and *Youngberg,* custody creates a "special relationship" because the inmate or patient, having been deprived of his liberty interest, is forced to rely upon the State to provide him with care and protection. The protection component is necessary because the individual is placed, by the State, in a potentially dangerous environment created and preserved by the State. Whether the dangerous environment is within the four walls of a prison complex or within the parameter of prison property is a distinction without a difference. In each in-

stance, individuals are forced to rely upon the State to protect them from dangers created or heightened by actions of the State. Thus, in *Walker v. Rowe*, 535 F.Supp. 55 (N.D.Ill.1982), the Court found that the State had an affirmative duty to protect prison guards from the reasonably foreseeable attacks of third persons. *Id.* at 59. The duty arose from the "special relationship" between an employee and his superiors as established by common law. *Id.*

The second factor in determining whether a "special relationship" exists is whether the State has expressly stated its desire to provide affirmative protection to specific individuals. *Id.* In *Fox* and *Martinez*, the State did not expressly state its desire to provide affirmative protection to members of the general public. In *Jensen*, where section 1983 actions were brought against state social services agencies on behalf of children who died as a result of beatings at the hands of their guardians, the court noted that the preamble of the South Carolina Child Protection Act does clearly express a desire to take affirmative steps to locate and protect potentially abused children. *Jensen*, 747 F.2d at 194–95 n. 11. Here, it is alleged by plaintiff's counsel that the State promulgated regulations which required that any inmate traveling beyond the fenced-in portion of the prison was to be accompanied by a guard. Arguably, the regulation, if it existed, is an express manifestation of the State's desire to provide protection for those prison employees who live on prison property. The existence of the regulation, at the very least, would confirm the State's recognition that the prison property outside of the fence, where some prison employees live, is not an altogether safe neighborhood. The regulation may also be indicative of the State's desire to take affirmative steps to provide protection for those it has required to live there. The combination of the State's requirement that plaintiff maintain a residence on this property and the regulation, if it exists, requiring inmates who venture beyond the fenced-in portion of the prison to be accompanied by a guard argues in favor of finding that a "special relationship" existed.

The third factor that the *Jensen* court identified as being pertinent to a "special relationship" analysis is whether the State knew of the Billie Jo Dickens' plight. *Id.* Once again, it is arguable here that the promulgation of the regulation precluding inmates from venturing beyond the fenced-in portion of the prison without accompanying guards signifies that the State was aware of the potential dangers in requiring prison employees to live on unsupervised prison property. It is also probative of the extent to which the State intended to protect the plaintiff. This strengthens the argument that some sort of special relationship may have been created.

The *Jensen* court's conclusion that a constitutional right to affirmative protection may exist was rendered inapplicable in that case because of the existence of a good faith immunity defense. *Id.* at 194–96. Arguably, this holding relinquishes the Fourth Circuit's "special relationship" analysis to the realm of mere dicta. Even so, it is not dicta without force for it provides this Court with an analytical framework with which to approach the question of whether, under the facts alleged in this case, the State could enter into a "special relationship" with the plaintiff thereby creating an affirmative duty to protect her from harm.

Defendants argue that the Supreme Court's *DeShaney* decision limits the scope of the *Fox–Jensen* "special relationship" analysis to the custodial context only. This Court disagrees and finds that *DeShaney* is factually distinguishable.

Joshua DeShaney and his mother alleged that various agencies and employees of Winnebago County, Wisconsin deprived Joshua of his liberty interest in bodily integrity by failing to protect him from his physically abusive father. The County had removed Joshua from the custody of his father once but subsequently returned him. Even though a social worker had collected a great deal of evidence showing that the father continued to beat Joshua, the County failed to intervene and took no action. Joshua's father finally beat him so severely that he suffered permanent brain damage

and was rendered profoundly retarded. Joshua and his mother sued the County under section 1983 alleging that the county deprived him of his liberty interest in violation of the Fourteenth Amendment's Due Process Clause by failing to intervene to protect him against his father's violence.

The Supreme Court held that the County's failure to provide Joshua DeShaney with adequate protection against his father's violence did not violate his rights under the Due Process Clause. The Court rejected the DeShaneys' argument that because the State was aware of Joshua's plight and proclaimed an intention to protect him from his father, it entered into a "special relationship" with Joshua to protect him. The Court identified *Martinez* as the probable basis for this argument and noted that the DeShaneys read *Martinez* too broadly. The Court also suggested that the Fourth Circuit's dicta in *Jensen* granted too much significance to the *Martinez* dicta.[4]

However, in denying the section 1983 claim, the Court provided the following analysis as to why an affirmative duty to protect did not arise in Joshua's case:

While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*DeShaney*, 109 S.Ct. at 1006. As the above passage indicates, a central part to the Court's analysis is the fact that the State played no part in the creation of the dangers that harmed Joshua, nor did the State do anything to render him more vulnerable to those dangers. It is the recognition of this fact which distinguishes *DeShaney* from the case at bar.

■ Here, it is alleged by counsel for the plaintiff that not only did the State play a part in making Billie Jo Dickens more vul-

**4.** The Supreme Court reiterated the DeShaneys' argument as follows:

Having undertaken to protect Joshua from this danger—which petitioners concede that State played no part in creating—the State acquired an "affirmative duty," enforceable through the Due Process Clause, to do so in a reasonably competent fashion. Its failure to discharge that duty, so the argument goes, was an abuse of governmental power that so "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 [72 S.Ct. 205, 209, 96 L.Ed. 183] (1952), as to constitute a substantive due process violation.

In an appended footnote the Court goes on to say:

The genesis of this notion appears to lie in a statement in our opinion in *Martinez v. California*, 444 U.S. 277 [100 S.Ct. 553, 62 L.Ed.2d 481] (1980). In that case we were asked to decide, *inter alia*, whether state officials could be held liable under the [Due Process Clause] for the death of a private citizen at the hands of a parolee. Rather than squarely confronting the question presented here—whether the Due Process Clause imposed upon the State and affirmative duty to protect—we affirmed the dismissal of the claim on the narrower ground that the causal connection between

the state officials' decision to release the parolee from prison and the murder was too attenuated to establish a "deprivation" of constitutional rights within the meaning of section 1983. *Id.*, at 284–85 [100 S.Ct. at 558–59]. But we went on to say:

"[T]he parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to them responsible under the federal civil rights law. *Id.* at 285 [100 S.Ct. at 559] (footnote omitted)."

Several of the Courts of Appeals have read this language as implying that once the State learns that a third party poses a special danger to an identified victim, and indicates its willingness to protect the victim against that danger, a "special relationship" arises between State and victim, giving rise to an affirmative duty, enforceable through the Due Process Clause, to render adequate protection.

The Court then cites the *Jensen* case.

nerable to the dangers which led to her death, but that the State actually played a part in the creation of those dangers. For example, it is alleged by plaintiff's counsel that as a precondition to Swader's employment by the State, her daughter, as a member of the household, was required to maintain a residence on prison property. It is further alleged that the only ingress and egress through this property is by private roads owned and maintained by the State for use in the operation of the penal facility. Thus, plaintiff's decedent was placed in an environment not perfectly analogous to the "free world" of Joshua DeShaney, but closer to a situation analogous to incarceration or institutionalization where the State exercises a greater degree of control. Furthermore, it is alleged by plaintiff's counsel that prison regulations promulgated by the State provide that inmates venturing beyond the fenced-in portion of the prison were permitted to do so only if accompanied by a prison guard. Yet, plaintiff's counsel alleges that Waller, an inmate serving a life sentence for rape, was permitted to range outside of the fence without supervision. Finally, it is alleged that immediately after Waller left the fenced-in portion of the prison, he raped and strangled Billie Jo Dickens.

Taking the alleged facts as true, as we must in ruling on the pending motion, this Court finds that the State's involvement in the creation of the circumstances resulting in Billie Jo Dickens's death is much more closely interrelated to her death than the involvement of Winnebago County in the creation of the circumstances leading up to the injuries suffered by Joshua DeShaney. Because the case *sub judice* involves alleged facts which are notably different from those considered by the *DeShaney* Court, this Court holds that the *DeShaney* decision is distinguishable on its face and, therefore, does not control the disposition of defendants' motion to dismiss. Thus, while the *Fox–Jensen* "special relationship" analysis was not applicable to the DeShaney's argument for relief under section 1983, its applicability here, under the

facts as alleged, is still appropriate and consistent with the *DeShaney* Court's ruling.

This Court notes that the Fourth Circuit has considered two affirmative duty cases since the *DeShaney* decision. The first, *Milburn v. Anne Arundel County Department of Social Services*, 871 F.2d 474 (4th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989), involved a section 1983 claim brought by a former ward of foster parents against his former foster parents, a public and private hospital, a municipality and their employees for child abuse or failure to report child abuse. Applying *DeShaney*, the appellate court held that the injuries sustained by the plaintiff occurred while he was outside of the custody of the State, *Id.* at 476, and that, furthermore, his former foster parents were not "state actors" within the meaning of section 1983. *Id.* at 476–79. Neither *Fox*, nor *Jensen*, were mentioned in the opinion and there is no indication that plaintiff attempted a "special relationship" argument.[5]

The second case considered by the Fourth Circuit since *DeShaney* was *Piechowicz v. United States*, 885 F.2d 1207 (4th Cir.1989). Plaintiffs were the survivors of a witness in a criminal trial and his sister-in-law who were murdered by a contract killer associated with the defendant in the underlying criminal case. The plaintiffs sought to recover under the Federal Tort Claims Act alleging, *inter alia*, that the victims had entered into a "special relationship" with the United States in that they had agreed to testify against the criminal defendant and, therefore, the United States was negligent in not providing the witnesses with protection through the federal witness protection program. The Fourth Circuit, citing, importantly, *Fox* and *Martinez*, agreed with the district court that no "special relationship" had developed between the victims and the United States. *Id.* at 1214. In discussing the *DeShaney* opinion, the court did state that "*DeShaney* suggests that dicta to our opinion in *Jensen* [citations omitted], as well as

---

5. The opinion below was not published.

decisions of other Courts of Appeals, granted too much significance to the *Martinez* dicta." *Id.* at 1214 n. 10. What the Fourth Circuit did not discuss, however, was that the *DeShaney* Court's reference to *Jensen* was in the context of the DeShaneys' argument that a "special relationship" existed even where the State played no part in creating the danger giving rise to Joshua's injury.

It is the opinion of this Court that the Fourth Circuit's decisions subsequent to the *DeShaney* opinion signal no retreat from the "special relationship" analysis developed in *Fox* and *Jensen.*

This Court further notes that two other courts have extended the affirmative duty analysis beyond the strict custodial context since *DeShaney*. In *Horton v. Flenory*, 889 F.2d 454 (3rd Cir.1989), the Third Circuit limited the *DeShaney* holding to situations in which the state is not involved in the harm, either as a custodian or an an actor. In that case, the City of New Kensington promulgated an official policy that the Police Department would maintain a hands off policy with respect to events transpiring in private clubs. *Id.* at 456. When a private club employee was beaten and killed as a result of a club owner's "investigation" of a theft, the employee's estate brought a civil rights action against the City and the Police Department. The suit focused upon the fact that while the employee was being "interrogated," a New Kensington police sergeant arrived on the scene and confirmed that the "investigation" could continue. The Third Circuit affirmed a jury's finding of liability and money judgment. The Supreme Court granted petitions for certiorari filed on behalf of the defendants, vacated the appellate court's judgment, and remanded the case for further consideration in light of the Supreme Court's opinion in *DeShaney*. Upon remand from the Supreme Court, the Third Circuit addressed the question of custody. The court reasoned that although the employee was not incarcerated or institutionalized at the time of his death, he was

*de facto* in custody of the police department since the club owner was acting pursuant to the policies of the New Kensington Police Department and pursuant to the instructions of a New Kensington police sergeant. *Id.* at 458. The Third Circuit noted that unlike the passive role of the neglectful social workers in *DeShaney*, the role of the police sergeant was much more affirmative. Accordingly, the Third Circuit found the requisite degree of state control necessary to take the case outside of the scope of the *DeShaney* decision.

Similarly, in *Pagano by Pagano v. Massapequa Public Schools*, 714 F.Supp. 641 (E.D.N.Y.1989), a federal district court extended the state's duty to protect beyond the custodial setting when it held that an elementary school student's action against school officials, for failing to prevent continuing attacks and abuse by other students, stated a claim under section 1983. The defendants had argued that no "special relationship" existed between the defendants and the plaintiff and therefore no affirmative duty arose to protect the plaintiff from harm. Relying on *Doe v. New York City*, 649 F.2d 134 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (duty exists to protect child from harm in foster home situation),[6] the district court disagreed stating: "We consider elementary school students who are required to attend school, the truancy laws still being in effect, to be owed *some* duty of care by defendants which may or may not rise to the level required in the [*Estelle–Youngberg* circumstances]." *Id.* at 643 (emphasis in original). Of particular significance to the district court was the fact that the victim and the perpetrators were under the care of the school in its *parens patriae* capacity at the time the alleged abuse occurred. The district court found that the school/child relationship was more analogous to the *Doe* case (which found an affirmative duty to protect a child in a foster home situation) than to *DeShaney*. Accordingly, it held that the defen-

**6.** The *DeShaney* Court specifically refused to reach the question of whether a duty exists if the child had been placed in a foster home by

the state agency and been abused there. *DeShaney*, 109 S.Ct. at 1006 n. 9.

dants' failure to take preventative action could be considered to rise to the level of deliberate indifference to affirmative duty. *Pagano,* 714 F.Supp. at 643.

*Horton* and *Pagano* illustrate that the concept of "custody" is flexible enough to include circumstances which occur outside of a strictly custodial context. This Court finds that an equally flexible application of the "custody" requirement is appropriate under these circumstances where the State required its employees to live on prison property and had manifested an intent to protect them by requiring that all inmates travelling outside of the prison gates be accompanied by a guard.

This Court holds, then, that the representations in plaintiff's complaint, which are broad enough to include those representations by plaintiff's counsel in argument, have alleged sufficient facts which, if proved, show that a "special relationship" existed between the defendants and Billie Jo Dickens. The existence of a special relationship would establish an affirmative duty on the part of the State to protect her. A breach of this duty would constitute a cognizable claim under section 1983. Although the exact nature of the relationship between plaintiff and the defendants has not been made pellucidly clear by brief or argument, this Court is not prepared to hold on this record that the defendants did not, as a matter of law, owe any affirmative duty to prison employees and their families required to live on a portion of prison property in which inmates were allowed to work. Accordingly, the Rule 12(b)(6) motion to dismiss plaintiff's section 1983 claim is DENIED.