GOLDBERG, Circuit Judge,
dissenting:
The majority in the case before us found that a school district should not be held responsible for the reasonable safety of its students. The majority opinion holds that a student cannot recover from a public school, or school officials, for injuries sustained during school hours. I respectfully dissent.
The district court dismissed this action for failure to state a claim according to Federal Rule of Civil Procedure 12(b)(6). Dismissal is inappropriate unless the reviewing court determines that the plaintiff could not recover under any set of facts. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 523 (5th Cir.1994); K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 847 (7th Cir.1990). For purposes of this review, the court should assume that the facts alleged in the plaintiff’s pleadings are true. Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir.1994).
The limited pleadings in this case sketch a rough image of the “transformation of our public schools from institutions of learning into crucibles of disaffection marred by increasing violence from which anguish and despair are often brought to homes across the nation.” Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991 (10th Cir.1994). Andrew Gaston, an innocent fifteen-year-old student, was shot in the head and killed while in the halls of A. Maceo Smith High School. Drumestic Contreal Brown, a non-student, took a school bus to get to the school, entered the school building, created a disturbance, and ultimately fired the shot that killed Gaston.
While this story would be tragic in any school, the trauma is magnified in this case by the apparent ineptitude and fecklessness of the school district and school officials in ensuring student safety. School policy required students to purchase school identification badges, but there was no one to check them. . The school also had metal detectors on the premises, but they were packed away in boxes. The majority opinion refuses to acknowledge that these security measures were aimed at preventing the precise incident that transpired on October 23, 1991. The purpose of these measures is clear and self-evident. The ID badges were intended to control the presence of non-students on campus, not to serve as useless decoration. The metal detectors were intended to eliminate the presence of weapons on the school grounds, not to consume space and collect dust like museum pieces. The target of these detectors are the guns and knives fueling the violence in our schools.[1]
Both of these security measures were inadequately employed, and Brown was able to commit his fatal deed. If the school had not completely disregarded its security measures, Brown might have been prevented from roaming the school halls and his gun might have been detected. Indeed, this lawsuit might never have materialized, and Ga-ston would have finished his studies at A. Maceo Smith High School.
The majority and the district court concluded that the pleadings did not sufficiently allege facts or present a legal basis for recovery. I respectfully disagree on both counts.
The complaint in this case alleges sufficient facts to survive a Rule 12(b)(6) attack. In dismissing this case, the district court relied in part on Streetman v. Jordan, 918 *205 F.2d 555 (5th Cir.1990). The district court essentially held that the plaintiff did not allege facts with sufficient specificity to overcome the heightened pleading requirement for § 1983 claims. See Streetman, 918 F.2d at 557. However, the Supreme Court invalidated the heightened pleading requirement in Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, — U.S. —, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Leatherman held that plaintiffs in § 1983 cases need only meet the pleading requirements established in Federal Rule of Civil Procedure 8(a). Id., — U.S. at—, 113 S.Ct. at 1161. Our system of pleading has evolved from the ancient system of the forms of action to the modern notice pleading standard. We should not return to the feudal days of microscopic analysis of pleadings, but rather embrace the present and future. The plaintiffs pleadings need only adumbrate the evidence expected in the prosecution of the ease. Thus,
“[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.”
Taylor v. Ledbetter, 818 F.2d 791, 794 n. 4 (11th Cir.1987) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989) (citing Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Miller v. Stanmore, 636 F.2d 986 (5th Cir.1981); Johnson v. Wells, 566 F.2d 1016 (5th Cir.1978)). This case should not be prematurely dismissed and the plaintiff should be permitted to develop evidence to support his claims. Other courts have upheld analogous claims. See e.g., Waechter v. School Dist. No. 14-030, 773 F.Supp. 1005, 1010 (W.D.Mich.1991); Lichtler v. County of Orange, 813 F.Supp. 1054 (S.D.N.Y.1993); Pagano v. Massapequa Public Schools, 714 F.Supp. 641, 643 (E.D.N.Y.1989); cf. Taylor v. Ledbetter, 818 F.2d 791, 793 (11th Cir.1987) (en banc).
The majority posits and refutes two potential theories for recovery in this case. I find the majority’s application of the facts to each theory problematic.
I.
The majority recognizes that under the due process clause of the Fourteenth Amendment, a state actor is held accountable for foreseeable injuries when it creates or permits a dangerous situation. See Salas v. Carpenter, 980 F.2d 299, 309 (5th Cir.1992). This principle has been labeled the state-created danger doctrine. Although the plaintiffs pleadings set forth the requisite elements of a state-created danger claim, the majority not only refuses to find them but also denies the plaintiff the opportunity to demonstrate the state-created danger at A Maceo Smith High School on October 23, 1991.
The majority distills three elements that constitute the state-created danger doctrine from prior cases. The first element is whether the environment was dangerous. The second is whether the state actors knew the environment was dangerous. The final element is whether the state actors created an opportunity that would not otherwise have existed for the injury to transpire. The requisite allegations in the pleadings will be examined below.
The state forced Gaston to attend A. Ma-ceo Smith High School through its compulsory education laws. See Tex.Educ.Code Ann. § 21.032(a) (Vernon 1987 & Supp.1993). The majority points out that to claim Gaston attended school voluntarily is to deny reality.[2] See Majority Op. at 203, n. 7; D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1380 (3rd Cir.1992) (Sloviter, C.J., dissenting), cert. denied, — U.S.—, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993) (“The compulsory nature of public school attendance is not lessened by the fact that a few fortunate students have the option to attend *206 private school or be educated at home”)-[3] A. Maceo Smith High School was arguably dangerous on October 23, 1991. While schools may not be per se dangerous, the plaintiff should be given an opportunity to prove that A. Maceo Smith High School was dangerous. The very limited discovery in this case reveals past instances of school violence. Additional evidence and testimony might have further indicated dangerousness.[4] The fact-finder, after a trial, should have considered the evidence and determined whether A. Ma-ceo Smith High School was dangerous or safe on October 23, 1991.
Without factual development, we should not pass with finality on the knowledge and level of culpability of the school district and officials in this case. The majority’s interpretation of “actual knowledge” seems too cramped in view of § 1983 jurisprudence. The Supreme Court and this court have held that liability may attach to the state through inaction or nonfeasance as well as through action and malfeasance. Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (holding that a failure to promulgate a policy may demonstrate deliberate indifference and be grounds for liability under § 1983); Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 454 (5th Cir.1994) (en banc), cert. denied, — U.S.—, 113 S.Ct. 1066, 122 L.Ed.2d 371 (1993) (“We ... hold that a school official’s liability arises ... when the student shows that the official, by action or inaction, demonstrates a deliberate indifference to his or her constitutional rights.”) (emphasis supplied).[5] We stated in Gonzalez v. Ysleta Indep. Sch. Dist. that
“[t]he ‘deliberate indifferent’ requirement permits courts to separate omissions that ‘amount to an intentional choice’ from those that are merely ‘unintentionally negligent oversight[s].’”
996 F.2d 745, 756 (5th Cir.1993) (emphasis supplied) (quoting Rhyne v. Henderson County, 973 F.2d 386, 392 (5th Cir.1992)); see also Salas v. Carpenter, 980 F.2d 299, 307 (5th Cir.1992). The deliberate indifference standard is a high legal threshold,[6] used to distinguish simple negligence from the type of willful blindness that is so extreme that it qualifies as active conduct for determining culpability. Id. See also Temkin v. Frederick County Comm’rs, 945 F.2d 716, 722-23 (4th Cir.1991), cert. denied, — U.S. —, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992) (citing cases of deliberate indifference); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1145 (3d Cir.1990); White v. Rochford, 592 F.2d 381, 385 (7th Cir.1979) (discussing liability based on gross negligence and reckless disregard for the safety of others). The language found in these opinions demonstrates that the defendants here may be liable under *207 § 1983 for inaction and failure to obtain knowledge about the school’s security. The plaintiff effectively alleged that the school officials were deliberately indifferent to the danger at the high school, in that they knew or should have known about the environment at A. Maceo Smith High School. At this stage of the litigation, it is understandable that the plaintiff does not have an abundance of evidence of the nebulous mental state of the officials. Cf. Thornbrough v. Columbus and Greenville R. Co., 760 F.2d 633, 640 (6th Cir.1985) (discussing the difficult task of proving defendants’ mindsets). However, that does not justify denying the plaintiff his day in court to attempt to show what may be difficult but still possible to prove. Furthermore, there is no evidence in this record to support the majority’s assertion that the risk of a non-student invader was unforeseeable by the defendants. The majority claims it is inappropriate to draw an inference of knowledge from the security measures in this case, because such an inference would discourage schools from taking steps to ensure student safety in the future. However, it is just as inappropriate to draw an inference of safety from these security measures. Furthermore, the majority’s position effectively rewards official ignorance and irresponsibility. The courts should encourage student safety, not half-hearted security policies. In addition, even without an inference of dangerousness or knowledge from these measures,[7] there is a past history of firearms and violence at A. Maceo Smith High School which, in conjunction with other evidence that might have come to light through further discovery, could have proved whether the school was the dangerous or safe.[8] Based on this record, we cannot know whether A. Maceo Smith High School was a paragon of security or a “snake pit.”[9]
Finally, the majority requires an extreme showing of affirmative action from school officials, as it concludes that the defendants cannot be liable because they “did not release a known criminal in front of [Gaston’s] locker.” Majority Op. at 202. This position depreciates § 1983.[10] If the majority’s logic were followed, then a school that was deliberately indifferent to the risk of fire would be immune to suits for fire related injuries as long as the principal did not strike the match. This simply cannot be true. The state need not be the last link in the causal chain to be liable for injuries. In Estelle, the Court found a duty for the state to provide medical care for injuries that were not caused by a state actor, but rather through the performance of a work assignment. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In Youngberg, the Court acknowledged that the institutionalized patient has a right to medical care even though the state did not cause his injuries. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. *208 2452, 73 L.Ed.2d 28 (1982); see also Lichtler v. County of Orange, 813 F.Supp. 1054, 1056 (S.D.N.Y.1993) (stating that a county could be liable for student injuries resulting from a tornado which struck during school hours). If the state places an individual in a precarious situation, it cannot avoid liability if the peril materializes in the form of injury. Foreseeability is a question of fact and is not to be answered by speculative conclusions.
II.
The majority presents and rejects the notion that a public school owes its students any duty to maintain a reasonably safe environment in which to conduct classes. The majority bases this conclusion primarily on DeShaney v. Winnebago County Dep’t Soc. Serv’s., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and some circuit cases interpreting DeShaney. However, DeSha-ney does not foreclose the possibility of some obligation to protect students from violence in public schools. The DeShaney Court stated that when the state takes custody of an individual, an affirmative duty arises under § 1983 to ensure the individual’s safety and well-being. 489 U.S. at 199-200, 109 S.Ct. at 1005. Thus, the court’s inquiry is two-fold. The court must determine whether Gaston was in state custody, and if so, whether the state breached its duty to safeguard him.
The majority found that Gaston was not in state custody. Determining whether an individual is in state custody is typically accomplished by' examining whether the state has isolated the individual from sources of private aid, or when,
“the State by the affirmative exercise of its power so restrains an individual’s liberty that it renders him unable to care for himself, and at the same time fails to provide for basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety.... ”
DeShaney, 489 U.S. at 200, 109 S.Ct. at 1005 (citations omitted) (emphasis supplied). A “special relationship” between the state and the individual arises when the state takes the person in custody.[11] In this case, the majority finds that Gaston was not in custody because he could go home at the end of the day and he was not locked in a cell. However, “the concept of ‘custody’ is not so rigid as to be defined only in terms of a prison or mental hospital.” Swader v. Virginia, 743 F.Supp. 434, 439 (E.D.Va.1990).[12] Gaston’s parents may have been responsible for his food, clothing, shelter, and medical care, but both Gaston and his parents relied on the *209 school to ensure his safety so that he might return home.[13] Thus, this case is analogous to Griffith v. Johnston, where this court found that the state owed a duty to children removed from their homes and placed under state supervision. 899 F.2d 1427, 1439 (5th Cir.1990).[14] The parents clearly entrusted their children’s safety to the school district. Indeed, state law places a school in loco parentis. See Majority Op. at 207 n. 7. Schools often use their role as a justification for their actions affecting a student’s rights. See New Jersey v. T.L.O., 469 U.S. 325, 336-41, 105 S.Ct. 733, 739-42, 83 L.Ed.2d 720 (1985) (recognizing a school’s “need to maintain an environment in which learning can take place”); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 684, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). Under the rule pronounced by the majority today, parents who want to attempt to protect their children from any harm will have to take turns standing guard at the school building and playground.
At this stage in the lawsuit, it is premature to suggest whether the alleged failures on the part of the school district and school officials should be characterized as negligent, grossly negligent, callously indifferent, or any other legal label imposing liability. Let us return to our role of reviewing the law, and allow the fact-finder to determine the facts. Pleading strictures should not be used to prevent cases where the pleadings do not provide extremely detailed factualistic assertions. Let us take steps to ensure that our schools do not become shooting galleries or places where criminals are free to roam and terrorize the student body. Our schools should be places of learning, and personal safety is a vital component of a learning environment.

. Because this case was dismissed prematurely, the plaintiff was not permitted to develop additional evidence relating to the aggregate state of affairs at the school. Inferences of safety and dangerousness require a fact-finder to examine and weigh additional evidence relating to the aggregate state of affairs at the school. Recognizing the nature of the security measures at A. Maceo Smith High School does not necessarily compel an inference of dangerousness, as the majority seems to suggest. An objectively safe school might implement security measures to maintain and safeguard its security and reputation. The purpose of a trial is to permit a fact finder to draw inferences based on evidence adduced through the discovery process.

. Thus, this court's decision in Leffall is clearly distinguishable from the instant case. Leffall v. Dallas Independent Sch. Dist., 28 F.3d 521 (5th Cir.1994). We are not attending an after-school dance in this case, where students must pay for the privilege to attend, as was the case in Leffall. In this case, we are attending school, studying our books, and attendance is mandatory.

. The Supreme Court has gone further, stating that
"[l]aw reaches past formalism. And to say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme.”
Lee v. Weisman, - U.S. -, -, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992).

. The mere presence of trained adults on school grounds does not negate the potential dangerousness of the school. If trained individuals were deliberately indifferent to the plight of the students, the school might be as dangerous or more dangerous than if they were not present. The parents may have relied upon the presence of trained adults, and therefore not pressed for additional security measures. "Failing to act may, under certain circumstances, be more detrimental than acting.” Taylor by and through Walker v. Ledbetter, 818 F.2d 791, 800 (11th Cir.1987); see also P.L.C. v. Housing Authority, 588 F.Supp. 961 (W.D.Pa.1984) (holding that a duty arose through detrimental reliance).

. See generally, Actionable Inaction: Section 1983 Liability for Failure to Act, 53 Univ.Chi.L.Rev. 1048 (1986).

. The deliberate indifference standard is difficult to meet for several reasons. One reason is to prevent the Fourteenth Amendment from becoming a "font of tort law.” Daniels v. Williams, 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (citations omitted). Another reason is to protect state actors from excessive financial exposure. See Canton v. Harris, 489 U.S. 378, 391-92, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989). The latter seems to be one of the majority’s primary concerns. See Majority Op. at 203 & n. 7. The proper way to address this concern is through the use of a high culpability requirement and requiring that the deliberate indifference “be closely related to the ultimate injury.” Canton, 489 U.S. at 391, 109 S.Ct. at 1206. Insulating deliberately indifferent school districts and officials by preventing student suits goes to far to protect the public fisc at the expense of defenseless school children.

. Such an inference does not require a great leap of faith. The ID badge policy seems to be aimed at distinguishing students who belong on campus from strangers, and the metal detectors are a step in eliminating the presence of weapons from school grounds. Taken together, these two measures seem to indicate that the presence of armed non-students was, or should have been, foreseeable to the school officials.

. See Answers to Interrogatories. The only discovery allowed in this case was in the form of one set of interrogatories.

. Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982).

. Some courts have implied that the action/inaction distinction is crucial in determining whether the students may recover for injuries from the school districts and officials. See, e.g., D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1373-75 (3d Cir.1992) (en banc), cert. denied, -U.S. --, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); J.O. v. Alton Community Unit School Dist. 11, 909 F.2d 267, 272 (7th Cir.1990). However, other cases have criticized a curtailed and limited view based on an act/omission distinction because it leads to contrived and artificial results.
“We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it .will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.”
Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982). See also White v. Rochford, 592 F.2d 381 (7th Cir.1979) (“[I]t seems incongruous to suggest that liability [under § 1983] should turn on the tenuous metaphysical construct which differentiates sins of omission and commission.”). Indeed, the Supreme Court stated deliberate indifference may result from acts or omissions. Estelle, 429 U.S. at 104-05, 97 S.Ct. at 291.

. The term "special relationship” has become talismanic and complicated. Archie v. Racine, 847 F.2d 1211, 1223 (7th Cir.1988). This court has expressly avoided determining whether a school has a special relationship with its students. See Leffall, 28 F.3d at 528-29; Doe v. Taylor Independent Sch. Dist., 15 F.3d 443, 451 n. 3. Some courts have noted difficulty with the concept.
"The contours of what constitutes a ‘special relationship' between a municipality, acting through its officials, and its citizens are hazy and indistinct.”
Ellsworth v. Racine, 774 F.2d 182, 185 (7th Cir.1985). However, there are several examples of special relationships from prior cases. See, e.g., Estelle, 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91 (state owes duty to prison inmates); Youngberg, 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2458 (state owes duty to mental patients). Indeed, at least two circuits have intimated that a special relationship is not required to find custody or a duty to protect individuals.
"Nothing in DeShaney suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates.... Liability of municipal policymakers for policies or customs chosen or recklessly maintained is not dependent upon the existence of a ‘special relationship' between the municipal officials and the individuals harmed.”
Stoneking v. Bradford Area School Dist., 882 F.2d 720, 725 (3d Cir.1989) (citing Canton v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) and Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir.1989), cert. denied, 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989)); see also Jensen v. Conrad, 747 F.2d 185, 194 (4th Cir.1984), as discussed in Swader v. Virginia, 743 F.Supp. 434, 439 (E.D.Va.1990) (stating Jensen survives DeShaney) ("a right to affirmative protection need not be limited by a determination that there was a 'custodial relationship.' The Fox [v. Custis, 712 F.2d 84 (4th Cir.1983) 3 court ruled that a right to protection could arise from a custodial or other relationship.”) (emphasis original).

. There are many examples of special relationships and custody in cases applying § 1983. See e.g., Stoneking v. Bradford Area School Dist., 882 F.2d 720, 723-34 (3d Cir.1989); Milonas v. Williams, 691 F.2d 931, 942 (10th Cir.1982), cert. denied, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983) (finding that juveniles in boarding school in state custody). Courts have *209 found a duty when the state takes a child from the natural parents and places the child under state supervision in order to secure an adoption. Griffith v. Johnston, 899 F.2d 1427, 1439 (5th Cir.1990) (a "special relationship [arose] when [the state] removed [children] from their natural homes and placed them under state supervision”); K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 849 (7th Cir.1990); Taylor v. Ledbetter, 818 F.2d 791, 795 (11th Cir.1987) (en banc). A duty arises to protect prison inmates from other inmates. DeMallory v. Cullen, 855 F.2d 442, 445 (7th Cir.1988). A special relationship was found between the state and a confidential informant's wife. G-69 v. Degnan, 745 F.Supp. 254, 265 (D.N.J.1990). See also Fox v. Custis, 712 F.2d 84, 88 (4th Cir.1983) ("[a constitutional right to protection by the state] may arise out of special • custodial or other relationships created or assumed by the state”); Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982); Simmons v. Philadelphia, 947 F.2d 1042, 1067 (3rd Cir.1991) (state owed duty of safety to pre-trial detainee due to custody); Horton v. Flenory, 889 F.2d 454, 458 (3d Cir.1989) (state owed duty to suspect in private club based on functional custody by police officer); Lichtler v. County of Orange, 813 F.Supp. 1054, 1056 (S.D.N.Y.1993) ("Since power implies responsibility, where governmental agencies or entities utilize sovereign compulsion to exercise coercive powers, a correlative duty exists of due care toward those subjected to such compulsion.”).

. Maldonado v. Josey, 975 F.2d 727, 735 (10th Cir.1992) (en banc) ("I cannot fathom who, other than a teacher or other school staff member, is capable of ensuring the ‘reasonable safety' of school-children during the school day and class periods.”) (Seymour, concurring).

. Other circuits have followed this approach in the foster care context.
"Here, in contrast, the state removed a child from the custody of her parents; and having done so, it could no' more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in jail or prison in which his health or safety would be endangered, without violating his rights' either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner.... In either case the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to lions.”
K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 849 (7th Cir.1990) (citations omitted). See also Yvonne L. v. New Mexico Dep’t of Human Serv’s., 959 F.2d 883 (10th Cir.1992) (holding that children in the state's custody are owed an affirmative duty of protection); Doe v. New York City Department of Soc. Serv’s., 649 F.2d 134 (2d Cir.1981), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).