833 F.Supp. 560 (1993)
B.M.H., an infant, who sues By her mother and father and next friends, C.B. and P.B.,
and
C.B. and P.B., Plaintiffs,
v.
The SCHOOL BOARD OF the CITY OF CHESAPEAKE, VIRGINIA, in its official capacity,
and
Linda Singleton, individually, and in her official capacity as a Teacher at Crestwood Middle School for the 1990-91 School Year,
and
Edward Gary Webb, individually, and in his official capacity as a Teacher at Crestwood Middle School for the 1990-91 School Year, Defendants.
Civ. A. No. 2:92cv1221.
United States District Court, E.D. Virginia, Norfolk Division.
September 23, 1993.
*561 *562 Bruce Howard Kushner, Chesapeake, VA, Michael F. Imprevento, Andrew Michael Sacks, Stanley E. Sacks, Sacks, Sacks & Imprevento, Norfolk, VA, for plaintiffs.
Carol Thomas Stone, John O. Easton, Virginia Futral Shevlin, Jordan, Coyne, Savits & Lopata, Fairfax, VA, for defendants.

OPINION AND ORDER
CLARKE, District Judge.
This matter comes before the Court on the Defendants' Motion to Dismiss the Plaintiffs' Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The Amended Complaint contains three counts: Count I asserts a claim under 42 U.S.C. § 1983 against all Defendants; Count II asserts a 42 U.S.C. § 1983 claim against the Defendant School Board only; and, Count III asserts a cause of action against all Defendants under Virginia law based upon pendent and diversity jurisdiction. After considering the briefs presented by both parties and hearing oral argument, the Court GRANTS the Defendants' Motion to Dismiss as to Counts I and II. As to Count III the motion is GRANTED IN PART and DENIED IN PART. As to the Defendants' miscellaneous grounds for dismissal, the Motion to Dismiss is DENIED.

BACKGROUND
In construing the allegations made in the Amended Complaint and the argument of Plaintiffs' counsel most liberally in the Plaintiffs' favor, the factual contentions on which the Court decides the Defendants' motion are brief. In December of 1990, the Plaintiff B.M.H., daughter of Plaintiffs C.B. and P.B., was a thirteen year old, eighth-grade student enrolled at Crestwood Middle School in the City of Chesapeake, Virginia. Around December 4, 1990, a male student ("Student H.") in B.M.H.'s fifth-period history class threatened B.M.H. by telling her "I am going to screw you, no matter what, even if it's in school and even if I have to rape you." B.M.H. reported this threat to Defendant Singleton, who was apparently the fifth-period history teacher. Defendant Singleton then made Defendant Webb, a fellow teacher, aware of the threat made to B.M.H.
Subsequently, the complaint alleges that Singleton and Webb (collectively the "teachers") failed to take action to discipline Student H. for his remark or to prevent him from actually accomplishing it, even though they had stated an intention to do so. Three days after the reported threat by Student H., on December 7, 1990, B.M.H. was sexually assaulted by Student H. on school grounds. The assault, for which Student H. was later convicted in Virginia Family Court, consisted of him fondling B.M.H.'s genital regions, penetrating her vagina, and threatening her while another student stood as a "look-out."
Based upon these contentions, the Plaintiffs' Amended Complaint alleges three counts against the Defendants. Count I, asserted against the Defendant teachers and the Defendant School Board, seeks damages for the violation B.M.H.'s federal civil rights under 42 U.S.C. § 1983[1] for failure to affirmatively protect a student with whom they held a "special relationship" under the substantive *563 component of the Fourteenth Amendment Due Process Clause. Count II, asserted only against the Defendant School Board, likewise asserts a claim under 42 U.S.C. § 1983 for failure by the School Board to provide adequate policies or instruction to deal with alleged constitutional deprivations such as this. Finally, Count III, brought against both the Defendant teachers and the Defendant School Board, asserts common law tort offenses for negligence, gross negligence, and recklessness under the laws of Virginia.[2]
The Defendants have moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss all counts for failure to state a claim upon which relief can be granted. Through memorandum and oral argument in support of this motion, the Defendants have asserted numerous grounds for dismissal. As to all three counts, the Defendants contend that state-based sovereign immunity bars this action against them. On Count I, they maintain that no cause of action can be sustained under 42 U.S.C. § 1983 because the Amended Complaint shows no constitutional deprivation, fails to allege action "under color of state law," and fails to allege sufficiently egregious conduct. In regards to Count II, the Defendants assert that no cause of action has been stated by the Plaintiffs because they failed to allege an "official policy or custom" of the Defendant School Board as the "moving force" behind the Defendant teachers' alleged inaction. As to Count III, the Defendants maintain that sovereign immunity, the Plaintiffs' failure to establish a duty owed B.M.H. under statute or common law, and attenuated causation all support dismissal of the state claims.[3]

STANDARD OF REVIEW
In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the complaint is construed in the light most favorable to the plaintiffs and their allegations are taken as true. Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The complaint should not be dismissed unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); Bruce v. Riddle, 631 F.2d 272, 273-74 (4th Cir.1980). A court should not dismiss a complaint even if it appears on the face of the pleadings that the chance of recovery is very remote. Scheuer, 416 U.S. at 236, 94 S.Ct. at 1686.

ANALYSIS

A. State Sovereign Immunity Defense to the 42 U.S.C. § 1983 Claims
As an initial grounds for dismissing both counts based upon 42 U.S.C. § 1983,[4] the Defendants assert that the existence of state sovereign immunity for government officials *564 bars this federal civil rights action.[5] The Court finds no support for the Defendants' assertion of this bar as to the Defendant teachers or School Board.[6]
Assuming arguendo that Virginia law would bar suit against the Defendants, it would not operate to prevent maintenance of this federal action against them. In Howlett v. Rose, 496 U.S. 356, 376, 110 S.Ct. 2430, 2443, 110 L.Ed.2d 332 (1990), the Supreme Court, relying upon the supremacy clause, expressly noted that "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 ... cannot be immunized by state law.... [because it] would transmute a basic guarantee into an illusory promise...." (citation omitted). Therefore, immunity in regards to § 1983 violations is governed by federal law. Id. Relying on Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Defendants assert that this federal law still provides sovereign immunity for state actors carrying out discretionary governmental duties. Defs.' Mem.P. & A. in Reply to Pls.' Opp'n to Mot. to Dismiss at 3. Contrary to the Defendants' reading of Owen, the Supreme Court clearly rejected the argument that the common-law immunity for discretionary functions applies in § 1983 suits. It stated that the "doctrine cannot serve as the foundation for a good-faith immunity under § 1983.... because a municipality has no `discretion' to violate the Federal Constitution." Id. at 649, 100 S.Ct. at 1414.
Therefore, the Court finds no support for the assertion that the Plaintiffs' § 1983 claims are barred by any state-based sovereign immunity that might apply under these circumstances. The Defendants' motion, on that basis, is thus DENIED.

B. Count I: Failure to State a Claim Under § 1983 for Deprivation of B.M.H.'s Fourteenth Amendment Liberty Interest
In Count I, the Defendants assert that no grounds have been alleged or exist on which a § 1983 cause of action can be maintained. Three basic arguments are presented by the Defendants in this regard: 1) that there is not present between B.M.H. and the Defendants the type of relationship needed to create an affirmative duty upon the Defendants to protect B.M.H.; 2) that the Amended Complaint fails to show that Defendants were acting "under color of state law;" and 3) that the Plaintiffs have failed to allege behavior by the Defendants sufficiently egregious enough to state a § 1983 claim. Because the Court agrees that there is no "special relationship" between B.M.H. and the Defendants under the Fourteenth Amendment Due Process Clause, it only finds it necessary to address that contention in detail.[7]
*565 In order to maintain an action under 42 U.S.C. § 1983, a plaintiff must demonstrate that he has been deprived, under color of state law, of a right secured by the Constitution or laws of the United States. Baker v. McCollan, 443 U.S. 137, 146-47, 99 S.Ct. 2689, 2696, 61 L.Ed.2d 433 (1979); Jensen v. Conrad, 747 F.2d 185, 190 (4th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985); Fox v. Custis, 712 F.2d 84, 87 (4th Cir.1983). Therefore, before allowing an action to stand under § 1983, the Court must inquire as to whether such an asserted right actually exists. Jensen, 747 F.2d at 190.
In this case, the Plaintiffs contend that B.M.H. has a liberty interest under the substantive component of the Fourteenth Amendment Due Process Clause to be protected by the Defendants from harms such as those experienced. They suggest that this affirmative duty to protect B.M.H. arises from the "special relationship" that exists between the student and the Defendants as a result of several factors, including the Virginia statute requiring parents of children between the ages of five and seventeen to send them to school or have them taught at home;[8] several other Virginia statutes that charge state schools with various duties and responsibilities;[9] the fact that the Defendant teachers knew about the threat to B.M.H.; and the fact that the Defendant teachers expressed an intention to protect B.M.H.
The issue of whether a child who is in attendance at a public school as result of a state mandatory attendance law and who makes her teachers aware of a threat to her safety is in such a relationship with those teachers and the school system as to create an affirmative duty upon them to protect her under the Fourteenth Amendment Due Process Clause is one of first impression in this Court and the Fourth Circuit. Taking into account the arguments pressed by both sides, the discussions of the Supreme Court and Fourth Circuit on what constitutes a "special relationship," the results reached by other circuits on this particular issue, and public policy concerns, the Court finds there is, as a matter of law, no "special relationship" under the Fourteenth Amendment created by these circumstances on which B.M.H. can maintain an action for a constitutional deprivation.
In evaluating whether a right is protected under the Fourteenth Amendment,[10] it must be remembered that the Due Process Clause merely places a limitation on a state's power to act, it does not enact a general obligation for a state to provide governmental aid or to protect its citizens from harms caused by private actors. DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 *566 L.Ed.2d 249 (1989).[11] It has been recognized, though, that when the state enters into certain types of relationships with citizens that it may owe them some affirmative duty of care and protection. See, e.g., Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (Eighth Amendment's cruel and unusual punishment prohibition requires states to adequately care for the medical needs of prisoner because lack of liberty prevents caring for himself); Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (holding that substantive component of Fourteenth Amendment Due Process Clause mandates that states take steps to reasonably protect involuntarily committed mental patients from themselves and others).
The rationale behind this Estelle-Youngberg line of cases is that
when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs  e.g., food, clothing, shelter, medical care, and reasonable safety  it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.
DeShaney, 489 U.S. at 200, 109 S.Ct. at 1005. Therefore, "the affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id.
While cases such as Estelle and Youngberg are clear examples of when liability will attach under § 1983 for failure to carry out an affirmative duty, the DeShaney case provides a distinct illustration of the end of the § 1983 spectrum where there is no liability. In DeShaney, the plaintiff, Joshua DeShaney, and his mother brought a § 1983 suit against the local department of social services. The department had been aware that Joshua's father, with whom the boy lived, might be physically abusing Joshua. This led to an investigation, during which time Joshua was removed from his father's custody. As a result of the investigation, the department's advisors were unable to find sufficient evidence of abuse that would allow permanent removal of Joshua from his father's home. Thereafter, upon Mr. Deshaney's agreement to several conditions, Joshua was returned to his father's home. Despite the fact that twice after his return Joshua was treated by the local hospital for suspicious injuries and follow up observations by the department turned up signs of child abuse, Joshua was still allowed to remain with his father. It was not long after that Joshua was taken to the emergency room with serious brain injuries that left the four year old boy permanently retarded. The injuries were the result of his father's abuse.
That case presented the issue of whether the state's failure to adequately protect Joshua *567 against the known risk of harm from a private actor constituted an actionable claim under § 1983. In deciding that no § 1983 claim was stated, the Supreme Court carefully distinguished DeShaney from the Estelle-Youngberg cases based on the lack of a custodial relationship.
In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf  through incarceration, institutionalization, or other similar restraint of personal liberty  which is the `deprivation of liberty' triggering the protection of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means.
DeShaney, 489 U.S. at 200, 109 S.Ct. at 1006 (footnote omitted). The Court noted that Joshua was not in the state's custody when his father abused him, even though it knew of his danger and had once had him in the its custody. Therefore, the Court clarified that the state owes no affirmative duty of protection to a person who is harmed while in the custody of a private party, even if the state knows of the danger and expresses an intent to help him.
Thus, the Estelle-Youngberg and DeShaney cases provide clear demarcations for when an affirmative duty is or is not owed under the Due Process Clause. The matter before this Court is not as clear. B.M.H. was not in a situation like the prisoner in Estelle or the mental patient in Youngberg. She was not completely and absolutely dependent upon the state for her basic human needs. Likewise, she was not in the custody of Student H. when he molested her, as Joshua was when he was abused by his father in DeShaney. It is this Court's task to determine whether the circumstances surrounding B.M.H. place this matter more near to those of Estelle-Youngberg or DeShaney.
The Plaintiffs' "special relationship" theory rests upon the view that in some situations, where there is not the strict, Estelle-Youngberg-type of custody, the state still owes an affirmative duty because of its affiliation with a private party. This concept draws legitimacy from the DeShaney Court's notation that "other similar restraint[s] of personal liberty" might lead to an affirmative duty. 489 U.S. at 200, 109 S.Ct. at 1006. This "special relationship" idea also springs from the dicta of two Fourth Circuit cases decided prior to DeShaney, Fox v. Custis, 712 F.2d 84 (4th Cir.1983) and Jensen v. Conrad, 747 F.2d 185 (4th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), and from a decision of this Court post-dating DeShaney, Swader v. Virginia, 743 F.Supp. 434 (E.D.Va.1990).
In Fox, the Fourth Circuit first recognized that there may be some duty upon the state to provide protection to a citizen with whom it held a "special custodial or other relationship." 712 F.2d at 88. The Court did not define what type of facts might qualify as such a relationship, but did state that there was none present between state corrections employees and the victim of a negligently supervised parolee. Id.
A year later, in Jensen, the Fourth Circuit again addressed when a constitutional duty to protect might arise from a "special relationship." The factual setting there was quite similar to that of DeShaney. The administrators of the estates of two deceased children brought § 1983 suits against state and county social services departments, who knew of the abuse risks to the children, yet failed to prevent any harm.
While deciding the case on qualified immunity grounds, the Court, building upon the "other relationship" language from Fox, undertook to set out in dicta some factors that it might consider probative in evaluating whether an affirmative duty to protect exists. These included:
1) Whether the victim or perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident.... 2) Whether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals.... 3) Whether the State knew of the claimants' plight.
Jensen, 747 F.2d at 194-95 n. 11.[12]
The Plaintiffs attempt to use these factors from Jensen and this Court's application of *568 those factors in Swader, 743 F.Supp. 434, to demonstrate a "special relationship" between B.M.H. and the Defendants. In Swader, the plaintiff was a mother who was required as part of her job on the medical staff of a state prison to live on the prison grounds, outside of the lock-up area. She brought suit under § 1983 after her young daughter was killed by an inmate who was negligently allowed to venture unsupervised beyond the prison gates.
The Court faced two distinct issues in that case. First, whether the "special relationship" basis for recovery under the Jensen-Fox cases was still intact after DeShaney; and second, whether the state owed some affirmative duty of protection to the victim as a result of such a relationship. The Swader decision factually distinguished the circumstances in DeShaney, where "the State played no part in the creation of the dangers that harmed Joshua, nor did the State do anything to render him more vulnerable to those dangers," 743 F.Supp. at 441, from those of Mrs. Swader, where the State played some role in creating the danger. The Court determined that DeShaney merely ruled out a § 1983 suit where a private actor had complete custody. Therefore, the Jensen-Fox cases were not fully overruled.
Swader then undertook to apply the Jensen factors, even though it recognized that they were dicta, because they provided a framework from which to decide if the state owed the plaintiff's daughter an affirmative duty of protection. As to the first factor, which focuses on custody, the Court noted that custody is "not so rigid as to be defined only in terms of a prison or mental hospital." Id. at 439. It followed from this that the Court found the first factor satisfied because
the individual is placed, by the State, in a potentially dangerous environment created and preserved by the State. Whether the dangerous environment is within the four walls of a prison complex or within the parameter of prison property is a distinction without a difference. In each instance, individuals are forced to rely upon the State to protect them from dangers created or heightened by actions of the State.
Id. at 440.
As to the second factor, concerning an intent of the state to protect, the Court took notice of a state regulation that manifested the intention of Virginia to protect prison employees living on prison grounds. Id. Finally, the Swader court noted that the third, knowledge-of-the-victim's-plight prong was satisfied because the existence of a regulation that prohibited inmates from wandering unguarded beyond the prison gates showed the state's awareness of the inherent danger. Id.
Relying upon Swader, the Plaintiffs assert that B.M.H.'s circumstances fall well within these factors to show an affirmative duty created by her "special relationship" with the state. They maintain that the mandatory school attendance laws satisfy the first prong; that the statutes demonstrating concern for student protection and the teachers' expressed intent to protect B.M.H. fulfill the second prong; and that B.M.H.'s reporting of the threat to the teachers satisfies the third part.
Before undertaking to determine whether Swader controls the decision in this case, it is necessary to look more closely at the standing and usefulness of the Jensen factors. First, it should be recognized that in two Fourth Circuit "special relationship" cases decided just before Swader and a decision of this Court since then, the three factor test has not been applied. In Piechowicz v. United States, 885 F.2d 1207 (4th Cir.1989), the Court seemed to step away from the factors toward a more custody-based test when it concluded that
we rest our disposition of this ["special relationship"] issue on our holding that Fifth Amendment substantive due process protects the liberty interest only of persons affirmatively restrained by the United *569 States from acting on their own behalf.[13]
Id. at 1215 (footnote omitted).[14] Likewise, in Edwards v. Johnston Cty. Health Dep't, 885 F.2d 1215 (4th Cir.1989), an opinion handed down by another panel of the Fourth Circuit on the same day as Piechowicz, the Court clarified that "the State's constitutional obligation [to provide affirmative protection] does not arise until it `takes a person into its custody and holds him there against his will.'" Id. at 1219 (quoting DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005). In a recent opinion, Williamson v. City of Va. Beach, 786 F.Supp. 1238, 1255 (E.D.Va.1992), aff'd, 991 F.2d 793 (4th Cir.1993), this Court noted that Piechowicz emphasized a single "relevant factor in evaluating special relationship claims: `substantive due process protects the liberty interests only of persons affirmatively restrained by the (State) from acting on their own behalf.'" (quoting Piechowicz, 885 F.2d at 1215).
It is true that this Court's ruling in Swader placed weight upon the three factors of the Jensen dicta. In light of the Piechowicz, Edwards, and Williamson decisions and the views held by other courts on the Jensen factors,[15] it is this Court's present opinion that the single relevant factor in determining if an affirmative duty exists under the Fourteenth Amendment is whether the state has so restrained the victim as to prevent him from acting on his own behalf.[16] Furthermore, this approach, which places no emphasis on the considerations suggested by the second or third Jensen factors, more closely comports with the Supreme Court's holding in DeShaney which minimized the state's expressed desire to assist an individual and the state's knowledge of the individual's plight as bases for finding an affirmative duty to protect the individual.
Accordingly, it is now necessary to evaluate whether B.M.H.'s presence in the public school under mandate of state law qualifies as the type of restraint upon students that implicates the Due Process Clause. While it is still true that the "concept of `custody' is not so rigid as to be defined only in terms of a prison or mental hospital," Swader, 743 F.Supp. at 439, the DeShaney, Piechowicz, and Edwards opinions require that the relationship between the state and the individual be one that so restrains the individual that he becomes almost wholly dependent upon the State for basic needs and unable to act on his own behalf. In Swader, that situation was present because the plaintiff was obligated to live on the prison grounds, the state created the danger to her, and she could turn only to the state to protect her. To the contrary, it was not present in DeShaney, because the state "played no part in [the dangers'] creation, nor did it do anything to render [Joshua] any more vulnerable to them." 489 U.S. at 201, 109 S.Ct. at 1006.
After evaluating the facts before it, the Court believes that Plaintiffs have failed to show any "special relationship" that would require affirmative action by the state under the Due Process Clause. Unlike Swader, this was not a situation where B.M.H. could only turn to the state for protection. She *570 was not so restrained by the mandatory school attendance laws that she was prevented from acting on her own behalf.
While the Fourth Circuit has not faced this particular issue, three other circuit courts of appeals have squarely addressed it. See D.R. v. Middle Bucks Area Voc. Tech. Sch., 972 F.2d 1364 (3rd Cir.1992) (en banc), cert. denied, ___ U.S. ___, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); Maldanado v. Josey, 975 F.2d 727 (10th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); J.O. v. Alton Commun. Unit Sch. Dist. 11, 909 F.2d 267 (7th Cir.1990). In all three decisions, the courts ruled that there was no relationship sufficient to create an affirmative duty under the Due Process Clause and, therefore, no § 1983 action could be maintained. District courts in at least two other circuits have reached that same conclusion in similar cases. See Dorothy J. v. Little Rock Sch. Dist., 794 F.Supp. 1405 (E.D.Ark.1992); Russell v. Fannin Cty. Sch. Dist., 784 F.Supp. 1576 (N.D.Ga.1992), aff'd, 981 F.2d 1263 (11th Cir.1992). District courts in two circuits have found a claim to be stated under these circumstances. See Pagano v. Massapequa Publ. Schs., 714 F.Supp. 641 (E.D.N.Y.1989); Waechter v. School Dist. No. 14-030, 773 F.Supp. 1005 (W.D.Mich.1991).
The Court finds more persuasive the discussions of law and policy relied upon by those courts refusing to recognize an affirmative duty. In the Third Circuit's en banc decision in Middle Bucks, the Court faced a situation where a teacher ignored the fact that a female high school student was repeatedly molested at school by fellow students over a six-month period. In what it described as a "classic case of constitutional line drawing in a most excruciating factual context," 972 F.2d at 1365, the Court ruled that a Pennsylvania mandatory school attendance law did not place a student in the custody of the school for Fourteenth Amendment purposes. It relied upon the fact that the "parents remain the primary caretakers, despite [the student's] presence in school." Id. at 1371. As continuing residents of their parents' home, "school children.... may turn to persons unrelated to the state for help on a daily basis.... [and] leave the school building every day. The state did nothing to restrict her liberty after school hours and thus did not deny her meaningful access to sources of help." Id. at 1372. The Court thus concluded that
the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs. Thus, the school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in DeShaney, particularly when their channels for outside communication were not totally closed.
Id. (citation omitted).
Likewise in Maldanado, the Tenth Circuit found that the New Mexico compulsory school attendance laws did not "create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school." 975 F.2d at 732 (footnote omitted). It recognized that there was some type of "custody" relationship between the students and the school, but
this custody does not amount to a restraint that prohibits the child and his parents from caring for the basic needs of the child. Compulsory attendance laws do not alter the fact that parents retain ultimate responsibility for their child's food, shelter, clothing, medical care, and reasonable safety.
Id. at 732-33.
In Alton, the Seventh Circuit emphasized the distinctions between the custody faced by prisoners or mental patients and that of students required to attend school. While recognizing that prisoners and mental patients were not necessarily an "exhaustive list of all persons to whom the state owes some affirmative duties," the Court was clear that "the government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises." 909 F.2d at 272. It based this conclusion on the view that
it cannot be suggested that compulsory school attendance makes a child unable to care for basic human needs. The parents *571 still retain primary responsibility for feeding, clothing, sheltering, and caring for the child.... The analogy of a school yard to a prison may be a popular one for schoolage children, but we cannot recognize constitutional duties on a child's lament.
Id. Therefore, the Court concluded that "[w]hatever duty of protection does arise is best left to laws outside the Constitution. ..." Id.
In Dorothy J., an Arkansas district court noted that public policy led it to the conclusion that it
must reject the broad view of `custody' based on state compulsory attendance laws.... [because s]chool officials would be subject to section 1983 liability anytime a child skinned his knee on the playground or was beat-up by the school bully, so long as the requisite `state of mind' was shown. More seriously, with the epidemic of deadly violence on many school campuses today, teachers would be constitutionally obliged to assume roles similar to policemen or even prison guards in protecting students from other students.
794 F.Supp. at 1414. Therefore, it concluded that no custodial or "special relationship" should or could be found between the plaintiff student and the school for due process purposes. Id. at 1421.
The Court finds the Middle Bucks, Maldanado, Alton, and Dorothy J. cases persuasive.[17] Even if public schools have some duty under state law to protect students, that is not enough to place the affirmative burdens of the Fourteenth Amendment Due Process Clause upon teachers, principals, and administrators to protect each child from possible harm by third parties.[18]
Therefore, for the stated reasons, the Court GRANTS the Defendants' Motion to Dismiss Count I of the Amended Complaint.

C. Count II: Failure to State a Cause of Action under 42 U.S.C. § 1983 against Defendant School Board for Lack of Policy that Adequately Protected B.M.H.'s Safety
Count II of the Amended Complaint alleges that the Defendant School Board's indifference in failing to provide adequate training or instruction as to incidents such as B.M.H.'s was a direct and proximate cause of the student's damages. The Defendants *572 move to dismiss that count on the grounds that the Plaintiffs have failed to adequately plead the existence of a policy or custom of the School Board that led to this incident.
The Plaintiffs bring this Count directly against the School Board under Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In Monell, the Supreme Court refused to allow liability on respondeat superior grounds, but did allow a § 1983 suit against a municipality or an arm of a municipality based upon a policy or custom of that entity that led to a constitutional deprivation. Thus, this second count is based upon the B.M.H.'s alleged constitutional deprivations occurring from School Board's actions or, more appropriately, inactions. Relying upon the Supreme Court's holding in City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Plaintiffs assert the School Board's liability based upon its "deliberate indifference" in failing to adequately instruct and train its employees and that this "indifference" was the "moving force" behind the Defendant teachers' inaction.
In their motion, the Defendants' suggest that dismissal is proper because the Plaintiffs have failed to "allege sufficiently a policy or custom that brought about the alleged constitutional violation." While this may be true, in light of the Court's resolution of Count I, it finds it unnecessary to reach that far for a grounds of dismissal.
After a careful reading of both Monell and City of Canton, the Court is of the opinion that a § 1983 action based on a "deliberately indifferent" policy or custom of the School Board first requires an underlying constitutional deprivation in order to stand. In Monell, the Supreme Court extended § 1983 in order to accommodate claims where "official municipal policy of some nature caused a constitutional tort." 436 U.S. at 691, 98 S.Ct. at 2036. In that case, the plaintiffs complained that the Board of Education and the Department of Social Services in New York had forced pregnant employees to take unpaid leaves before they were required for medical reasons. Id. at 660-61, 98 S.Ct. at 2020. The Court noted that these underlying acts were unconstitutional; only then could it go forward to inquire as to whether the municipality could be held liable under § 1983. Id. at 662, 98 S.Ct. at 2021.
Likewise, in City of Canton, the underlying harm was the result of clearly unconstitutional behavior. There the city police department failed to provide necessary medical attention to the plaintiff Harris, an arrestee. As in the case at hand, Harris based her § 1983 claim upon the failure to provide affirmative protection under the Due Process Clause of the Fourteenth Amendment. 489 U.S. at 381, 109 S.Ct. at 1201. The Court's analysis initially focused on "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Id. at 385, 109 S.Ct. at 1203 (emphasis added). It further stated that under the "failure to train" theory proffered by the plaintiff that "the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." Id. at 387, 109 S.Ct. at 1204 (emphasis added). The Court further clarified this distinction between the indifferent policy of the municipal entity and the underlying constitutional wrong when it stated that
[t]he `deliberate indifference' standard we adopt for § 1983 `failure to train' claims does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation. ... [A]s [this] case comes to us, we must assume the respondent's constitutional right to receive medical care was denied by city employees....
Id. at 388 n. 8, 109 S.Ct. at 1205 n. 8. Therefore, in order to state a § 1983 claim for "failure to train," a plaintiff must first demonstrate that some cognizable constitutional deprivation has occurred. As discussed in regards to Count I, supra, that burden has not been met in this instance.
Thus, in light of the clear language of Monell and City of Canton requiring an underlying constitutional deprivation before § 1983 liability may attach for an indifferent policy or custom of a municipal entity and given the Court's determination under Count I that no constitutional deprivation could have occurred in this matter because no *573 "special relationship" existed between B.M.H. and the Defendants, the Court GRANTS the Defendants' Motion to Dismiss Count II.

D. Count III: Failure to State a Claim under Virginia Common Law Negligence Standards
Count III of the Plaintiffs' Amended Complaint alleges a common law claim for negligence, gross negligence, and recklessness under the laws of Virginia.[19] The Defendants have asserted several bases for dismissal, including: sovereign immunity, no showing of a legal duty, no showing of a breach of any duty, and no causation. At this time, the Court finds it appropriate to address only the sovereign immunity defense; given that the other grounds involve more factually intense circumstances, the Court does not find them to be proper grounds upon which to grant the Defendants' Motion to Dismiss. As to sovereign immunity, the analysis will consider the Defendant School Board and Defendant teachers separately.

1. Defendant School Board's Liability
Since 1960, Virginia has recognized that the doctrine of sovereign immunity prevents a public school board from being held liable on account of its negligence. See Kellam v. School Bd. of Norfolk, 202 Va. 252, 117 S.E.2d 96 (1960). The Virginia Supreme Court based this decision upon
the proposition that school boards act in connection with public education as agents or instrumentalities of the state, in the performance of a governmental function, and consequently they partake of the state's sovereignty with respect to tort liability.
Id. at 258-59, 117 S.E.2d at 100.
The doctrine of sovereign immunity, as applied to the state, completely bars private actions for harm caused by the state's negligence in the absence of a statute to the contrary. Freeman v. City of Norfolk, 221 Va. 57, 58, 266 S.E.2d 885, 886 (1980). Therefore, the state and school boards, as instrumentalities of the state, are accorded absolute immunity unless it is waived. See James v. Jane, 221 Va. 43, 52, 282 S.E.2d 864, 869 (1980). Thus, even accepting as true the allegations of the School Board's gross negligence, the Court finds that all of the Plaintiffs' claims under Virginia law are barred by sovereign immunity. In so far as Count III is asserted against the Defendant School Board, the Court GRANTS the Defendants' Motion to Dismiss.

2. Defendant Teachers' Liability[20]
The Virginia Supreme Court has developed a very specific test for determining when a government agent gains the benefit of sovereign immunity for acts done while in that relationship with the governmental entity. See Messina v. Burden, 228 Va. 301, 321 S.E.2d 657 (1984); James v. Jane, 221 Va. 43, 282 S.E.2d 864 (1980).[21] Once the *574 agent is deemed to be protected by sovereign immunity, he is immunized from suit for his negligence, unless the plaintiff can demonstrate gross negligence. Colby v. Boyden, 241 Va. 125, 128, 400 S.E.2d 184, 186 (1991). Thus, sovereign immunity provides a less broad shield to liability for a governmental agent than to the governmental entity itself.
Applied to the circumstances before this Court, sovereign immunity clearly bars any action against the Defendant teachers for simple negligence. See Lentz v. Morris, 236 Va. 78, 372 S.E.2d 608 (1988) (applying the Messina-James factors to find that a public school teacher is protected by sovereign immunity for simple negligence). The Plaintiffs allege, though, that the neglect in this instance demonstrates gross negligence on the teachers' behalf. Under Virginia law, the Defendant teachers may be liable for such actions if they were taken in the "absence of slight diligence, or the want of even scant care." Frazier v. City of Norfolk, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987). Construing the allegations of the Amended Complaint most favorably to the Plaintiff, the Court is not convinced that no claim could be established on these grounds. Further consideration of this matter, after development of the factual record, on Summary Judgement or at trial, would be more appropriate. Therefore, in as far as Count III states a claim against the teachers for simple negligence or in their official capacities, the Court GRANTS the Defendants' Motion to Dismiss. As far as Count III states a claim against the teachers in their individual capacities for gross negligence, the Court DENIES the Defendants' Motion to Dismiss.

E. Miscellaneous Grounds for Dismissal
As noted earlier, the Defendants also seek the dismissal of several miscellaneous matters within the Amended Complaint. See note 5, supra. Two of those points require the Court's consideration since they might arise in the remainder of the action under Count III. First, the Court rejects the Defendants argument that Virginia Code § 8.01-36 does not allow for the parents' loss of services during minority. In Moses v. Akers, 203 Va. 130, 132, 122 S.E.2d 864, 865 (1961), the Virginia Supreme Court noted that two causes of action arise out of an injury to a minor: one on behalf of the minor himself, the other on the parents behalf for loss of services during minority and for treatment expenses. Therefore, the Defendants' Motion to Dismiss on those grounds is DENIED.
Finally, the Defendants contend that the claim for punitive damages should be dismissed for failure to allege sufficiently egregious conduct. Given the Court's decision allowing the Count III gross negligence action to go forward, it is appropriate that the Court await further discovery or trial for factual development before fully considering this part of the motion. Therefore, the Defendants' Motion to Dismiss on those grounds is DENIED.[22]

CONCLUSION
For these reasons, the Defendants' Motion to Dismiss the Plaintiffs' Amended Complaint under Rule 12(b)(6) is ORDERED as follows: as to Count I, GRANTED; as to Count II, GRANTED; as to Count III, GRANTED IN PART and DENIED IN PART; and as to the miscellaneous objections, DENIED.
IT IS SO ORDERED.
NOTES
[1] 42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding....
[2] The Amended Complaint shows two separate bases for this Court's jurisdiction over the state tort claim. First, this Court has supplemental jurisdiction over these pendent claims under 28 U.S.C. § 1367. Second, the Amended Complaint shows and counsel for both sides have agreed that all plaintiffs were citizens of the state of Florida at the time this action was filed. There has been no evidence that the defendants are other than citizens of Virginia. This, in conjunction with the monetary claims in excess of $50,000, provides the Court with diversity jurisdiction under 28 U.S.C. § 1332. Therefore, even if this Court were to dismiss the two counts based upon federal statute, it would still retain original subject-matter jurisdiction over the third, statelaw count.
[3] The Defendants' memorandum in support of their Motion to Dismiss presses arguments for dismissing several other parts of the Amended Complaint. These include: dismissing any part of the action based upon the Defendant School Board's failure to provide a policy manual on this type of situation, because the Virginia statute creating that obligation places the enforcement of it in the hands of the Virginia Attorney General, not private persons; dismissing the parents', C.B. and P.B., claim for "loss of services" of B.M.H., which they asserted as part of their parallel claims under Count III, see Va. Code Ann. § 8.01-36 (Michie 1950); and dismissing the Plaintiffs' claims for punitive damages under Count III, because there have not been sufficiently egregious circumstances alleged.
[4] The Court reserves discussion of the sovereign immunity doctrine as to the Count III, state claims. A more complete analysis of that will be made in Part D., infra.
[5] The Defendants suggest that sovereign immunity would apply to the teachers and then bar recovery versus the school board because its liability is derivative of the teachers' under respondeat superior. While this may be true as to the state law allegations, it is not so for the section 1983 counts. Liability under federal civil rights laws was not meant to be imposed on a respondeat superior basis. Ky. v. Graham, 473 U.S. 159, 168, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985); Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir.1977).
[6] It should be noted that both the teachers and the School Board are proper "persons" under 42 U.S.C. § 1983. As individuals, this is without argument as to Defendants Singleton and Webb. The School Board, as an arm of the City of Chesapeake, is likewise a proper "person" under the Supreme Court's holding in Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court clarified that "the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." Id. at 690, 98 S.Ct. at 2036 (footnote omitted).
[7] Were the Court to find it necessary to address the Defendants' second and third bases for dismissal of Count I, it would decide those issues in favor of the Plaintiffs on the Motion to Dismiss. Given the facts stated in the Amended Complaint, it is not clear as a matter of law that the conduct was not "under color of state law" or sufficiently egregious enough to support a § 1983 claim. The Court will not decide these factually intense issues without further discovery and development of the facts.
[8] Virginia Code Annotated § 22.1-254 (Michie 1950) states:

Every parent, guardian, or other person in the Commonwealth having control or charge of any child who will have reached [age five] and who has not passed the seventeenth birthday shall, during the period of each year the public schools are in session and for the same number of days and hours per day as the public schools, send such child to a public school or to a private, denominational or parochial school or have such child taught by a tutor or teacher of qualifications....
[9] Among the other Virginia statutes referred to by the Plaintiffs in their Amended Complaint are: Va.Code Ann. § 22.1-79 (Michie 1950), which states:

A school board shall: 1. See that the school laws are properly explained, enforced and observed; 2. Secure ... as full information as possible about the conduct of the public schools in the school division and take care that they are conducted according to law and the utmost efficiency; 3. Care for, manage and control the property of the school division....;
Va. Code Ann. § 22.1-253.12 (Michie 1950), which mandates that each school division have an up-to-date policy manual addressing, inter alia, "standards of student conduct and attendance developed by the locality and procedures for enforcement;" Va. Code Ann. § 22.1-280.1 (Michie 1950), which requires any school administrator who has knowledge of "[a]ny assaults, assault and batteries, `unlawful woundings,' maimings, and homicides, other than involuntary manslaughter, committed by a student on school personnel" to report it to the school division's superintendent (emphasis added); and Va. Code Ann. § 63.1-248.3 (Michie 1950), which requires school employees who have "reason to suspect that a child is abused or neglected" to report it immediately to the appropriate authorities.
[10] The Fourteenth Amendment, in applicable part, states: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1.
[11] As a preliminary matter, this distinction between acts of the state or its agents as compared to those of private actors is important. The law clearly recognizes liability under 42 U.S.C. § 1983 for sexual molestation or excessive punishment exacted on a school student by a public school employee. See, e.g., Ingraham v. Wright, 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977) (holding that where school officials deliberately decide to punish student by restraining liberty and exacting appreciable physical pain the Fourteenth Amendment is implicated); Doe v. Taylor Indep. Sch. Dist., 975 F.2d 137 (5th Cir.1992) (noting that the Constitution proscribes public school teachers from sexually molesting students), cert. denied, ___ U.S. ___, 113 S.Ct. 1066, 122 L.Ed.2d 371 (1993), en banc reh'g granted, 987 F.2d 231 (5th Cir.1993); Accord D.T. v. Independent Sch. Dist. No. 16, 894 F.2d 1176 (10th Cir.1990); Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3rd Cir.1989).

These cases comport with the notion that the Fourteenth Amendment requires state action before it is implicated. See Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Thus, the Ingraham and Doe-type cases, which involve a state agent acting affirmatively, directly implicate constitutional limitations of the Fourteenth Amendment. On the spectrum of § 1983 liability, these cases represent among the most clear examples of liability.
Therefore, the Court finds the Plaintiffs' reliance in oral argument on a case previously heard by this Court, No. 90-1544-N, inapposite. In that case, where a teacher allegedly molested the plaintiff student, Judge Smith found a "special relationship" and thus overruled the defendant's Motion to Dismiss. That matter falls more squarely within the Ingraham line of cases and, therefore, does not bind this Court to finding a "special relationship" in the current case, where the harm was done by a purely private actor.
[12] In hypothetically applying these factors to the case under consideration there, the Court noted that it would be a close call as to whether a "special relationship" existed. Given the Supreme Court's subsequent decision in DeShaney on similar factual grounds, it appears that no such relationship could have been found in Jensen.
[13] Although the "special relationship" discussion in Piechowicz arose in the context of a suit against the United States for Fifth Amendment deprivations, the Court noted that "the Fourteenth Amendment analysis elaborated in Martinez, Fox, and their progeny applies to the Fifth Amendment due process claims advanced by the plaintiffs." 885 F.2d at 1214.
[14] The Piechowicz panel further noted that the DeShaney opinion suggested that Jensen and Fox had placed too much significance on dicta from the Supreme Court's decision in Martinez v. Ca., 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), which had hinted that affirmative state duties to protect might arise in less strict custodial situations. Piechowicz, 885 F.2d at 1214 n. 10.
[15] See, e.g., Dorothy J. v. Little Rock School Distr., 794 F.Supp. 1405 (E.D.Ark.1992). There the court cited the three factor test from Jensen and noted that "[t]he second and third factors may no longer be relevant in light of DeShaney." Id. at 1416 n. 6.
[16] This single factor is much like the first factor suggested by the Jensen court, but it does not explicitly consider the custodial position of the perpetrator because, as the DeShaney Court emphasized, it is the state's restraint on the victim that implicates due process. Custody over the perpetrator is more important in cases such as Swader where the fact that the attacker was a known dangerous felon and was in the state's prison shows the state's affirmative role in creating the risk of harm to the victim.
[17] Those case holding to the contrary, Pagano and Waechter, do not provide any arguments that persuade this Court to find an affirmative constitutional duty to protect. The Pagano court provides little legal or policy support for its conclusion that "[w]e consider elementary school students who are required to attend school ... to be owed some duty of care by defendants which may or may not rise to the level required in the [prison or mental hospital] circumstances." 714 F.Supp. at 643.

The Waechter case purports to find a relationship between the defendant school and the plaintiff, a handicapped student who died after his recess teacher punished him by requiring that he run 350 yards in two minutes. In this case, the harm was inflicted by a state actor, the teacher, and thus a § 1983 claim is stated better under the Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) line of cases discussed in note 11, supra. Because it was not necessary for the Waechter court to find a special relationship for due process restraints to be implicated and because the Court disagrees that a school child is in the type of custody required for Fourteenth Amendment purposes, it finds the Waechter case unpersuasive.
[18] DeShaney stressed that not all violations of state law rise to the level of a § 1983 claim, when it noted that "[a] State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes; [b]ut not `all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment.'" 489 U.S. at 202, 109 S.Ct. at 1006 (quoting Daniels v. Williams, 474 U.S. 327, 335, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)). See also Owen v. City of Independence, 445 U.S. 622, 649, 100 S.Ct. 1398, 1414, 63 L.Ed.2d 673 (1980) (emphasizing that "when a court passes judgment ... in a § 1983 action, it.... looks only to whether the [defendant] has conformed to the requirements of the Federal Constitution and statutes.") (emphasis added); Jensen v. Conrad, 747 F.2d at 195 n. 12 ("A state statute, by itself, cannot create a substantive constitutional right.")

The Court also finds that the other Virginia statutes relied upon by the Plaintiffs, see supra note 9, do not help to make their case for a "special relationship" any stronger. Assuming arguendo that those statutes show an intent to care for school students, they do not assist the Plaintiffs in establishing a constitutional duty in light of this Court's reading of Piechowicz, Edwards, and Williamson that deprivation of a person's liberty is the controlling factor.
[19] Given the Court's dismissal of the federal claims in this matter under Counts I and II, it would be standard practice for the pendent state claims to be remanded for consideration by the state courts. See, e.g., Jensen v. Conrad, 747 F.2d at 196 (dismissing federal claims, but leaving consideration of plaintiff's rights under South Carolina tort law to courts of that state); Fox v. Custis, 712 F.2d at 90 (denying federal relief, but directing that state pendent claims be left for consideration by Virginia courts).

In this matter, though, as described in note 2, supra, the Court still has subject-matter jurisdiction over the state claims due to diversity jurisdiction under 28 U.S.C. § 1332. Therefore, the Court is not able to refuse jurisdiction over the state claims in this instance as opposed to when they are only pendent to dismissed federal claims.
[20] The Amended Complaint alleges these state law violations against the Defendant teachers in their official and individual capacities. A suit against them in their official capacities would, in effect, be a suit against their employer, the School Board, which is an immune entity. Therefore, any claims stated by the Plaintiffs against the teachers in their official capacities are DISMISSED.
[21] The test requires the consideration of four factors, which include:

1) the nature of the function performed by the employee;
2) the extent of the state's interest and involvement in the function;
3) the degree of control and direction exercised by the state over the employee; and
4) whether the act complained of involved the use of judgment and discretion.
See Messina, 228 Va. at 313, 321 S.E.2d at 663; James, 221 Va. at 53, 282 S.E.2d at 869.
[22] As to the argument that no private right of action exists under Virginia Code § 22.1-253.13:7 against the School Board for its failure to provide a policy manual, the Court finds it unnecessary to consider that argument in light of its finding as to the School Board's sovereign immunity.